

FILED

Dec 13 2017, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jason R. Delk
Delk McNally LLP
Muncie, Indiana

ATTORNEYS FOR APPELLEES

Karl L. Mulvaney
Nana Quay-Smith
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

Chad Bradford
O'Bryan Brown & Toner, PLLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Diana Zelman, <br> *Appellant-Plaintiff*, <br><br> v. <br><br> Central Indiana Orthopedics, P.C., and Francesca D. Tekula, M.D., <br><br> *Appellees-Defendants*. | December 13, 2017 <br><br> Court of Appeals Case No. 18A02-1705-PL-1121 <br><br> Appeal from the Delaware Circuit Court <br><br> The Honorable Marianne L. Vorhees, Judge <br><br> Trial Court Cause No. 18C01-1505-PL-11 |

**Brown, Judge.**

[1] Diana Zelman appeals the trial court's entry of summary judgment in a medical malpractice action in favor of Dr. Francesca D. Tekula and Central Indiana Orthopedics ("CIO"). Zelman raises one issue which we restate as whether the court erred in entering summary judgment in favor of Dr. Tekula and CIO. We reverse.

## Facts and Procedural History

[2] In March of 2010, Zelman began to experience right-side, low back pain, with no known injury and of unknown etiology. At some point later, she sought treatment and received a diagnosis of a synovial cyst on her lumbar spine. Zelman sought a consultation at CIO in Anderson, Indiana, where Dr. Tekula recommended that she undergo a procedure to remove the cyst. At a second appointment, where she was fitted for a post-operative back brace and to have pre-operative x-rays, Dr. Tekula recommended Zelman undergo a spinal fusion surgery.

[3] Zelman agreed to proceed, and Dr. Tekula performed the surgical procedure on May 27, 2010. Before Zelman was released from the hospital, Dr. Tekula shared with her that:

> a couple of unusual things had happened while [Zelman] was on the table in surgery, and that, while doing this fusion . . . cutting out the cyst and doing the one-level fusion, . . . [Dr. Tekula] had looked around in that area and had found another cyst and an even greater instability at another level.

Appellant's Appendix Volume 2 at 35-36. Dr. Tekula also shared at that time that she "went ahead and did a second-level fusion while she was in there, at the same time," because the "second instability was even greater than the first." *Id.* at 36. Dr. Tekula also shared that Zelman's "spinal lamina . . . was exceptionally long" and "longer than most other patients" seen by her, and as a result she "cut [Zelman's] lamina down." *Id.* When Zelman inquired if a medical reason existed to cut the lamina, Dr. Tekula answered negatively and shared that "she just found them to be unusually long." *Id.* at 37. At that time, Zelman was also told that the reason she was "probably experiencing a higher level of pain postoperatively" was "the fact that they had done so much in there." *Id.* at 38.

[4]     Following the procedure, Zelman felt an intense pain "unique to the postsurgical period" that was with her "chronically . . . in the region of the lumbar surgery" and "radiated from there up into [her] upper buttocks and a little bit bilaterally into [her] hips." *Id.* at 43-44. During this period, Zelman asked Dr. Tekula to tell her if something went wrong in the surgery "because it feels like something happened" and stated that it was driving her crazy that she did not "know what's going on." *Id.* at 68. In response to Zelman's inquiries, Dr. Tekula told Zelman that "everything went great and everything was great and everything was fine." *Id.* at 61. Dr. Tekula saw Zelman in Anderson at least two or three more times, and on October 7, 2010, ordered an MRI of the lumbar spine, lumbar flexion, and extension x-rays. Dr. Tekula shared with Zelman that the MRI showed that she was healing beautifully, that "everything

inside was fine. And the healing was coming along at the pace that she would have expected it to be, and that there was no reason, medical reason that she could see on the MRI for [Zelman's] continued pain." *Id.* at 70. Zelman was examined by Dr. Tekula, at the latest, on February 28, 2011.

[5] After a post-op office visit approximately a week or two after the procedure at which Zelman complained her foot was in a lot of pain that had not been fixed by the surgery, Dr. Tekula referred her to Dr. Steven Herbst, a foot specialist, to see about her foot specifically distinct from her upper leg. Zelman saw Dr. Herbst on June 28, 2010, he asked for imaging of her foot, and she stopped seeing him by December 2010. At some point before October 7, 2010, Zelman received sacroiliac and bursa injections with a Dr. Lillo. Zelman requested and completed physical therapy at both a facility near CIO in Muncie and a separate location, treated her pain by seeing a pain management specialist, Dr. Mariam Ibrahim, who tried various opioid pain medications until they found one that seemed to work better for Zelman than anything else, and located and saw a neurologist, Dr. Karen Vogel, who told her that, "based on her experience, [Zelman] was describing what, to her, sounded like nerve damage." *Id.* at 83. Dr. Vogel referred Zelman to two surgeons, Dr. Mobasser and Dr. Michael Coscia.

[6] In the single meeting they had, Dr. Mobasser shared with Zelman that, in his opinion, he "did not yet know what was wrong" based on his review of the records and their meeting and that he did not want to perform a surgery that he "felt fairly certain" would be "brutal" and had no guarantee to be one hundred

percent successful. *Id.* at 84-85. Zelman met with Dr. Coscia in November of 2013, and he performed Zelman's second surgery in 2014, sharing with her afterward in June of 2014 that during the surgery he "had found that there was no fusion, that there were no pedicle screws, that that was extremely unusual, because they've known for more than two decades that you have to use pedicle screws or you don't get a fusion." *Id.* at 90.

[7] On January 9, 2015, Zelman filed with the State of Indiana Department of Insurance a proposed complaint alleging medical negligence against Dr. Tekula and CIO. On January 20, 2017, Dr. Tekula and CIO filed a motion for summary judgment. In support of the motion, Dr. Tekula and CIO designated portions of Zelman's deposition in which she testified that, in early 2011, her "insurance company no longer deemed my visits post-op," that "too much time had gone by" and she was "suddenly getting charged for these new office visits," and that she remembers "asking Dr. Tekula why she was still seeing me" because "it was very different than any experience I'd had with any other surgeon in my past." *Id.* at 42-43. She testified that "still seeing the surgeon" was new to her because she had previously undergone surgical procedures and that she remembers "thinking it was around eight months post-op when [she] finally . . . didn't want to go anymore" and canceled her appointment with Dr. Tekula scheduled for March 2011. *Id.* at 43-45.

[8] When asked if she started to go to another orthopedic doctor after Dr. Tekula could not give her a reason for wanting her to come back, Zelman responded negatively and stated that she had "started with a pain management physician."

*Id.* at 46. Zelman testified that, prior to the cancelled March appointment, she "decided that [she] wasn't getting relief, enough adequate relief from the TENS unit or any of the therapies," and that she remembered "being surprised that [she] was in so much pain" and stated "I have always, in the past, prided myself on my ability to, for instance, live with the chronic neck pain, because I was trying to avoid a second neck surgery, cervical spine surgery." *Id.* at 34, 46. Zelman also testified that at some point "no longer did it feel like surgical pain that was healing," which "had abated pretty much most of the way," that prior to June 22, 2012, she thought about obtaining her medical records from Dr. Tekula, and that she was not seeing an orthopedic doctor in June 2012. *Id.* at 43.

[9] On March 10, 2017, Zelman filed a memorandum of law in opposition to the motion for summary judgment and designated additional selections from her deposition as evidence. In her testimony, Zelman answered affirmatively when asked if her pain decreased before she left the hospital. *Id.* at 62. Zelman testified that "the assumption was that as I healed from this surgery, I would feel better," and that she "was still in a lot of pain with [her] foot and it had not been fixed by the surgery." *Id.* at 63-64. Zelman also testified that the "chronic, intense ache that sometimes would get sharp" was a "very separate and distinct pain that [she] did not have before her surgery," that she was becoming "increasingly upset over the months" and Dr. Tekula "never had an explanation . . . as to why [she] was in this level of pain that was so different from what had already happened . . . with the fusion in [Zelman's] neck," and

that Zelman reached a point where she "was upset enough that [she] literally begged [Dr. Tekula] to do an MRI postoperatively . . . and find out what was going on inside of [her]." *Id.* at 67-68. Zelman testified that she remembered distinctly that Dr. Tekula told her that the MRI showed she was healing beautifully and that she was hoping that "something would show and be obvious." *Id.* at 70-71. Zelman also testified that she "was looking for an answer" by October 2010, and that a Dr. Peterson told her in an October 2012 office visit that he would get some surgical clinic names "so she can do a little more research on the back surgery." *Id.* at 71, 82. When asked if she thought she needed a second opinion, Zelman stated:

> No, not at that point. It sounds dumb, maybe, but no. I was told [by] Dr. Tekula the surgery went well, nothing happened in the surgery unusually [sic] other than she had done this extra work that I didn't know about in advance, that everything looked good in October at that MRI, I was healing beautifully. Everything was at the place it was supposed to be.
>
> I had no reason to think I needed a new spine or orthopedic physician. I just thought I was dealing with pain management issues, unexplained pain management issues.

*Id.* at 78-79.

[10] After hearing argument on the motion, the trial court granted summary judgment in favor of Dr. Tekula and CIO on April 20, 2017. In its order, the court found:

The undisputed evidence in this case shows that [Zelman] had the ability, with reasonable diligence, to discover the alleged negligence on or before March 1, 2013. She continued to suffer extreme pain after March 1, 2011. She continued to seek opinions from other physicians. The fact that she did not actually have the "brutal surgery" that allowed her to "discover" Dr. Tekula's alleged negligence in June, 2014, does not change the analysis in that she could have actually discovered the alleged negligence prior to March, 2013.

*Id.* at 127 (citations omitted).

## *Discussion*

[11] The issue is whether the trial court erred in entering summary judgment in favor of Dr. Tekula and CIO. We review an order for summary judgment de novo, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Our review of a summary judgment motion is limited to those materials designated to the trial court. *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001). In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. *Catt v. Bd. of Comm'rs of Knox Cnty.*, 779 N.E.2d 1, 3 (Ind. 2002). The moving party bears the initial burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine

issue of material fact. *Id.* We construe all factual inferences in favor of the nonmoving party and resolve all doubts as to the existence of a material issue against the moving party. *Id.* A medical malpractice case based upon negligence is rarely an appropriate case for disposal by summary judgment. *Chaffins v. Kauffman*, 995 N.E.2d 707, 711 (Ind. Ct. App. 2013).

[12] Zelman contends that the discovery rule allows her claim to be filed outside of the initial two-year limitation on medical malpractice claims imposed by the Indiana Medical Malpractice Act. Specifically, she argues she could not have discovered, and did not discover, Dr. Tekula's malpractice until after undergoing a brutal and intrusive surgery in June 2014, the delay in discovering the malpractice is attributable to repeated assurances by Dr. Tekula that her pain was unrelated to the May 2010 surgery, and there are genuine issues of fact regarding whether she was reasonably diligent in her actions post-operation in light of Dr. Tekula's representations.

[13] Dr. Tekula and CIO contend that the facts demonstrate that Zelman had information which would have led a reasonably diligent person to investigate and she produced no evidence showing that she used reasonable diligence to discover the alleged malpractice following her surgery. They further contend that she did not articulate a continuing wrong argument or a fraudulent concealment argument to extend the limitations period, and that the trial court correctly determined she had not created a question of fact that would overcome CIO and Dr. Tekula's showing that her proposed complaint was untimely under the occurrence-based Indiana Medical Malpractice Act.

Specifically, they argue that Zelman seeks to be excused from her failure to investigate the cause of her alleged unique, intense and continuing chronic back pain on the basis that Dr. Tekula allegedly told her that the surgery was healing nicely. They also argue that, even if her theory had merit, her relationship with Dr. Tekula ended by March 1, 2011, so her time to file suit expired at the latest by March 1, 2013, yet she did not file suit until January 9, 2015.

[14] Indiana's Medical Malpractice Statute of Limitations states:

(b) A claim, whether in contract or tort, may not be brought against a healthcare provider based on professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect . . . .

Ind. Code § 34-18-7-1. In determining whether a medical malpractice claim has been commenced within the medical malpractice statute of limitations, the discovery or trigger date is the point when a claimant either knows of the malpractice and resulting injury, or learns of facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury. *David v. Kleckner*, 9 N.E.3d 147, 152-153 (Ind. 2014). Depending on the individual circumstances of each case, a patient's learning of the resulting disease or the onset of resulting symptoms may or may not constitute the discovery or trigger date. *Id.* at 153. The point at which a particular claimant either knew of the malpractice and resulting injury, or learned of facts that would have led a person of reasonable diligence to have discovered the malpractice and resulting injury, must be determined. *Id.* If

such date lies two years beyond the occurrence of the malpractice, the claimant has two years within which to commence the action. *Id.* (quoting *Booth v. Wiley*, 839 N.E.2d 1168, 1172 (Ind. 2005)). Reliance on a medical professional's words or actions that deflect inquiry into potential malpractice can also constitute reasonable diligence such that the limitations period remains open. *Herron v. Anigbo*, 897 N.E.2d 444, 451 (Ind. 2008). Where the plaintiff knows of an illness or injury, but is assured by professionals that it is due to some cause other than malpractice, this fact can extend the period for reasonable discovery. *Id.*

[15] The designated evidence reveals that Zelman's medical malpractice claim arose from surgery conducted by Dr. Tekula on May 27, 2010, that Zelman experienced soon after an intense and chronic pain unique to the post-surgical period, and that she sought an explanation for the pain from a myriad of providers. Following the procedure, Zelman continued to meet with Dr. Tekula, who neither answered her inquiries into the causes of her pain nor provided a reason for wanting Zelman to keep returning months beyond the post-op period. Rather than identifying any potential problems from the surgery, Dr. Tekula instead told her that the procedure "went great." Appellant's Appendix Volume 2 at 61. Zelman eventually "literally begged" Dr. Tekula for a post-operative MRI, and after a review of the post-operative MRI, Dr. Tekula said that "everything inside was fine." *Id.* at 70.

[16] Notwithstanding Dr. Tekula's assurances, Zelman actively pursued an explanation for the pain and consulted several medical professionals, including

a foot specialist, a neurologist, and ultimately other back surgeons—one of whom shared his opinion that he did not know what was wrong with her after an examination of her medical records and described a second surgery as brutal with no guarantee of success.[1] Only after he completed the surgery in 2014 did Dr. Coscia give Zelman his opinion that the May 2010 surgery was not performed correctly with pedicle screws.

[17]  Given that the second surgery was required to discover the malpractice, and given that it was described as brutal with no guarantee of success, we cannot say as a matter of law that Zelman was not reasonably diligent when she did not have the second surgery sooner than she did. Thus, we hold that a genuine issue of material fact exists as to when Zelman's pain and diligent pursuit would have led her to discover that medical malpractice was the cause. *See David*, 9 N.E.3d at 153. Accordingly, we conclude that the trial court erred in granting CIO and Dr. Tekula's motion for summary judgment. *See id.* (observing that "the evidentiary facts, particularly Dr. Kleckner's assurances in early September, 2009—that likely would have minimized the plaintiff's suspicion and inquiry—support a reasonable inference that mid to late February, 2011, when Larry David first became suspicious of the possibility of

---

[1] Dr. Mobasser told Zelman that he did not want to do a second surgery because it would be "a brutal experience" and would require twelve to eighteen months to recuperate, "much worse than what [she] had experienced with the first surgery." Appellant's Appendix Volume 2 at 85. Indeed, in describing the second surgery, Zelman explained that a vascular surgeon "basically [took] out [her] internal organs" to reach the spine from the front of the abdomen and then had to "put everything back" before proceeding to harvest bone from her pelvis and then "reopen the scar" from the first surgery to "see what was going on in there." *Id.* at 87-88.

malpractice, was the point when Lisa or Larry David either knew of the alleged malpractice and resulting injury, or learned of facts that, in the exercise of reasonable diligence, should have led to the discovery of the malpractice and the resulting injury," and reversing the trial court's grant of the defendant's motion for summary judgment).

## *Conclusion*

[18] For the foregoing reasons, we reverse the entry of summary judgment in favor of Dr. Tekula and CIO and against Zelman.

[19] Reversed.

[20] Najam, J., and Kirsch, J., concur.